**MEYER DAIRY, INC., a Subsidiary of Milgram Food Stores, Inc., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 531–69.

United States Court of Appeals, Tenth Circuit.

Aug. 18, 1970.

698

Charles W. Medley, Kansas City, Mo., for petitioner.

Joseph C. Thackery, N.L.R.B. (Arnold Ordman, Dominick L. Manoli, Marcel Mallet-Prevost and Frank H. Itkin, N. L.R.B., with him on the brief), for respondent.

Before PICKETT, HILL and HICKEY, Circuit Judges.

PICKETT, Circuit Judge.

Meyer Dairy Distributors Association, a group of milk distributors, petitioned the National Labor Relations Board, in accordance with the provisions of Section 9(c) of the National Labor Relations Act, 29 U.S.C. § 159(c), for certification as an appropriate unit for collective bargaining with its alleged employer, Meyer Dairy Company. The Company resisted the petition primarily on the basis that the members of the Association were independent contractors as defined in the National Labor Relations Act, Section 2(3) (29 U.S.C. § 152(3) ). A hearing was had before a hearing officer. Thereafter the Regional Director, upon consideration of the entire record, affirmed the rulings of the hearing officer and found the members of the Association to be employees who, together with the Company retail route drivers, all working out of the Basehor, Kansas facility of Meyer, constituted an appropriate collective bargaining unit. He thereupon ordered an election. The Board summarily denied Meyer's request for a review of the Regional Director's decision, stating that it raised "no substantial issues warranting review." Following an election, the Association was certified as the exclusive representative for purposes of collective bargaining.

Meyer, still contending that the distributors were not employees, refused to bargain, whereupon unfair labor practice charges were filed. Meyer answered the complaint, admitting refusal to bargain, again alleging that the evidence was insufficient to support the findings of the Regional Director that the Association members were employees of the Company. Concluding that this issue had been previously litigated before the Regional Director, the Board granted a motion for summary judgment.[1] In the accompanying decision and order the Board concluded that Meyer, in its refusal to bargain with the Association, was guilty of unfair labor practices within the meaning of Section 8(a) (5) and (1). The conventional cease and desist order was entered. Meyer has petitioned for a review of the Board's order and the Board has requested an enforcement order.

The Company raises two issues. First, the contention is made that the Board's order should not be enforced because it improperly utilized summary judgment procedures. Secondly, Meyer contends that the evidence before the hearing officer conclusively established that the distributors were "independent

---

[1] In its order sustaining the motion for summary judgment, the Board stated:

"Inasmuch as the Respondent has had in the representation case the opportunity to litigate the issues raised in its Response to Notice to Show Cause and as the Respondent does not offer to adduce at a hearing any newly discovered or previously unavailable evidence, nor does it allege that any special circumstances exist herein which would require the Board to re-examine the decision made in the representation proceedings, we find that the Respondent has not raised any issue which is properly litigable in this unfair labor practice proceeding."

contractors" within the meaning of 29 U.S.C. § 152(3). On the first question, the essence of the Meyer position is that under the provisions of Section 10(a) and (b) of the National Labor Relations Act (29 U.S.C. § 160(a), (b) ) only the Board has power to decide charges of unfair labor practices and that Section 3(b) (29 U.S.C. § 153(b) ) does not permit the delegation of this power. In other words, Meyer says that at some stage of the proceedings it is entitled to a review of the record by the Board before a finding can be made that it has been guilty of an unfair labor practice.[2]

The provisions of 29 U.S.C. § 153(b) authorize the Board to delegate to regional directors its power to determine appropriate units for collective bargaining, to investigate and provide for hearings, determine whether a question of representation exists, and to call an election and certify the results. The Board may review any delegated action of a regional director. See National Labor Relations Board v. Duval Jewelry Co., 357 U.S. 1, 78 S.Ct. 1024, 2 L.Ed.2d 1097 (1958). The Board, by its rules, has provided for a very limited review. 29 C.F.R. § 102.67.[3] After exhaustion of his rights to review under the Board's rules, an employer may obtain a court review under 29 U.S.C. § 160. In some cases such review may be accom-

plished by refusal to bargain, thereby subjecting the employer to an unfair labor practices violation. This is the course followed by Meyer. The review available under § 160 is significantly different from that afforded under 29 C.F.R. § 102.67. The latter review is from the determination by the Regional Director in the establishment of a collective bargaining unit and the conclusion that the petitioners were employees, which in turn was based upon the proceedings before a hearing officer, and is before the Board only on a summary of the record allowed by the rule. The court review under § 160 is upon the entire record and deals with violations arising out of unfair labor practices—in this case, refusal to bargain.

The right of an employer to a Board review of the record of the Regional Director before finding that it is guilty of conduct constituting an unfair labor practice has recently been before the courts with opposite results. In Pepsi-Cola Buffalo Bottling Company v. N.L.R.B., 409 F.2d 676 (2d Cir.1969), cert. denied, 396 U.S. 904, 90 S.Ct. 219, 24 L.Ed.2d 181, the court held that before finding an employer guilty of an unfair labor practice, the Board must review the record "to determine whether his [the Regional Director's] decision was correct, and not whether it was clearly

---

2. Meyer's argument is not a challenge to the rule that the Board is not required to hold a *de novo* hearing upon factual issues which Meyer has or had an opportunity to present before the hearing examiner. Pittsburgh Plate Glass Co. v. National Labor Relations Board, 313 U.S. 146, 61 S.Ct. 908, 85 L.Ed. 1251 (1941); N. L. R. B. v. Lawrence Typographical Union No. 570, 376 F.2d 643 (10th Cir. 1967); N. L. R. B. v. Dewey Portland Cement Co., 336 F.2d 117 (10th Cir. 1964).

3. 29 C.F.R. § 102.67 in pertinent part is:
"(c) The Board will grant a request for review only where compelling reasons exist therefor. Accordingly, a request for review may be granted only upon one or more of the following grounds:

"(1) That a substantial question of law or policy is raised because of (i) the absence of, or (ii) a departure from, officially reported Board precedent.
"(2) That the regional director's decision on a substantial factual issue is clearly erroneous on the record and such error prejudicially affects the rights of a party.
"(3) That the conduct of the hearing or any ruling made in connection with the proceeding has resulted in prejudicial error.
"(4) That there are compelling reasons for reconsideration of an important Board rule or policy.
"(d) Any request for review must be a self-contained document enabling the Board to rule on the basis of its contents without the necessity of recourse to the record. * * * "

erroneous." In a subsequent case before another panel of judges the same court again considered this question and doubt was expressed by the writer of the opinion as to whether the *Pepsi-Cola* case "gave adequate recognition to the 1959 amendment of § 3(b) of the National Labor Relations Act empowering the Board to delegate various powers to a regional director, and the pertinent legislative history. \* \* \*" N.L.R.B. v. Olson Bodies, Inc., 420 F.2d 1187, 1190 (2d Cir.1970). The Fourth Circuit followed the *Pepsi-Cola* case in N.L.R.B. v. Clement-Blythe Companies, 415 F.2d 78 (1969).

■ The question was more recently carefully considered by the First Circuit in N.L.R.B. v. Magnesium Casting Company et al., 427 F.2d 114 (May 21, 1970), in which that court "parted company" with the *Pepsi-Cola* decision, holding that by the 1959 amendment to Section 3(b) Congress intended that within the limits specified, the Board was authorized to permit its regional directors to act for it. In answering the argument that the delegation of authority permitted by Section 3(b) is limited to Section 9 matters and cannot affect unfair labor practices proceedings under Section 10, the court said:

"The Company contends that the section 3(b) amendment *on its face* confines the Regional Directors to the exercise of powers under section 9, and thus that a Regional Director's unit determination pursuant to section 9 can have *no effect in a subsequent* unfair labor practice proceeding under section 10. That argument, however, overlooks the well established principle that when the Board resolves an issue in a representation proceeding under its section 9 powers, it is *not* required to reconsider the same issue and evidence in the ensuing unfair labor practice proceeding under section 10. E.g., Pittsburgh Plate Glass Co. v. National Labor Relations Board, 313 U.S. 146, 61 S.Ct. 908, 85 L.Ed. 1251 (1941); Amalgamated Clothing Workers of America v. N.L.R.B., 124

U.S.App.D.C. 365, 365 F.2d 898, 902–904 (D.C.Cir.1966); Riverside Press, Inc. v. N.L.R.B., 415 F.2d 281, 284 (5th Cir.1969). Since the section 3(b) amendment delegated to the Regional Directors the Board's powers to make unit determinations in representation proceedings, we think it follows that the Director's determination—when not set aside by the Board—is entitled to the same weight in the subsequent proceeding that the Board's own determination would have been accorded."

Although Judge Kaufman makes an appealing argument in the *Pepsi-Cola* case and the question is not free from doubt, we are convinced that the views expressed in the *Magnesium* case more nearly reflect the intent of Congress in the 1959 amendment to Section 3(b) as illustrated by its legislative history, and we adhere to the views therein expressed on that question.

With reference to the second issue, Congress by statutory language excluded independent contractors from the definition of the term "employee." 29 U.S.C. § 152(3). A determination of this issue requires a reference to the contractual provisions and other facts having to do with the performance of those contracts. Meyer is engaged generally in the business of processing and sale of fluid milk and related items. It employs personnel necessary for the operation of a general dairy business, including office help, production and maintenance workers, supervisors, and wholesale and retail route drivers who are paid salaries. In addition, the Company contracts with retail distributors who agree to purchase Meyer's products exclusively at prices fixed by Meyer, and to sell the same to customers in allocated districts. These distributors are generally known as "milk men" delivering dairy products to individual customers over fixed routes. They furnish their own special trucks for delivery of products within the assigned area and pay all costs and expenses of operation, including helpers if any are needed. Meyer furnishes to the

distributors suggested retail prices, but they are not bound by them. The contract provides for certain standards which the distributors must maintain if they are to retain the territory. These requirements generally are designed to meet health and cleanliness standards, and to promote sales of the Meyer products. Failure to meet the standards can result in a termination of a contract. Otherwise, the distributors have no obligation to Meyer except to pay for the products which they purchase. They do not act for the Company in any manner and are not paid any money by the Company. They have complete control over their sales and to whom credit will be granted. Losses from retail sales are those of the distributors. Income tax and social security payments are made as self-employed persons.[4] Distributors make their own arrangements for vacations. Many of them develop self-retirement plans, although, at their expense, they may participate in group medical and liability insurance through Meyer.

The Company affords to the distributors some advantages in the right to make purchases of vehicles and parts through the Company and to have repair work done in the Company garage, all of which must be paid for and is not compensation. If a distributor uses Company employees or vehicles, a charge is made therefor. The Company also furnishes printed material and some forms without cost to the distributors for promotional purposes and for assistance to them in handling the products.

In N.L.R.B. v. United Insurance Co., 390 U.S. 254, 256, 88 S.Ct. 988, 989, 19 L.Ed.2d 1083 (1968), the Supreme Court said that the obvious purpose of the 1959 congressional amendment excluding independent contractors from the definition of "employee" contained in the act "was to have the Board and the courts apply general agency principles in distinguishing between employees and independent contractors under the Act."[5] Agency is the relationship be-

---

4. The contract states:
    "It is agreed by and between the parties hereto that First Party, his agents and employees, in delivering and selling dairy products herein mentioned, is acting as principal, as an independent contractor, on his own responsibility, and in no particular is he acting for or in behalf of, or as agent of the Party of the Second Part, and the First Party shall have no right, power or authority to bind Party of the Second Part by any act or deed on his part, or on the day of his agents, servants or employees, and First Party hereby agrees to indemnify and hold harmless the Party of the Second Part from any loss or liability of whatsoever kind and character arising out of or in any manner connected with the execution of this contract."

5. H.R.Rept. No. 245, 80 Cong., 1st Sess. 18, in referring to the amendment, says:
    "An 'employee,' according to all standard dictionaries, according to the law as the courts have stated it, and according to the understanding of almost everyone, with the exception of members of the National Labor Relations Board, means someone who works for another for hire. But in the case

of National Labor Relations Board v. Hearst Publications, Inc. (322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944)), the Board expanded the definition of the term 'employee' beyond anything that it ever had included before, and the Supreme Court, relying upon the theoretic 'expertness' of the Board, upheld the Board. In this case the Board held independent merchants who bought newspapers from the publisher and hired people to sell them to be 'employees.' The people the merchants hired to sell the papers were 'employees' of the merchants, but holding the merchants to be 'employees' of the publisher of the papers was most far reaching. It must be presumed that when Congress passed the Labor Act, it intended words it used to have the meanings that they had when Congress passed the act, not new meanings that, 9 years later, the Labor Board might think up. In the law, there always has been a difference, and a big difference, between 'employees' and 'independent contractors.' 'Employees' work for wages or salaries under direct supervision. 'Independent contractors' undertake to do a job for a price, decide how the work will be done, usually hire others to do the work, and depend for their income not upon wages,

tween parties through which one is authorized to act for another generally or as to specified matters. Restatement (Second) of Agency § 1 (1957); Buchanan v. United States, 305 F.2d 738 (8th Cir.1962); Appleby v. Kewanee Oil Company, 279 F.2d 334 (10th Cir.1960). We think it quite clear that the distributors operate and own their individual businesses for the purpose of profit, the amount of which depends upon their own efforts. The Company pays no salary, commission or expenses. It has no investment of any kind in the distributor's operation. Its only benefit from the contracts is profit from the products purchased. The distributors do not collect any money for the Company. They do not represent and cannot bind the Company in any manner. There are no elements of agency present. They are, in effect, the holders of franchises to sell Meyer Dairy products within an agreed area free from business control of Meyer except that they are required to meet standards consistent with similar businesses in the area.[6] See Continental Bus System, Inc. v. N. L. R. B., 325 F.2d 267 (10th Cir.1963).

The petition for review is granted and the Board's order is vacated.

but upon the difference between what they pay for goods, materials, and labor and what they receive for the end result, that is, upon profits. It is inconceivable that Congress, when it passed the act, authorized the Board to give to every word in the act whatever meaning it wished. On the contrary, Congress intended then, and it intends now, that the Board give to words not far-fetched meanings but ordinary meanings. To correct what the Board has done, and what the Supreme Court, putting misplaced reliance upon the Board's expertness, has approved, the bill excludes 'independent contractors' from the definition of 'employee.' "

6. In this regard the contract provides:
"First Party shall be held and bound at all times to maintain standards of delivery which will comply with the regulations and policies of public health authorities and meet the standards as established by the Party of the Second Part and consistent with standards of

corporations, firms and individuals competitively engaged in similar dairy products business in the Greater Kansas City area in the following particulars:

"1. Insure with such mechanical efficiency of the delivery vehicle as will provide safe, prompt and regular service to customers.

"2. Sanitary condition of the delivery truck, including cleanliness and proper and approved storage of dairy products at temperatures required for wholesome condition of same at time of delivery to customers.

"3. Proper storage of damaged or defective containers of dairy products until re-delivery to Second Party.

"4. Condition of crates and all other paraphernalia employed by First Party in performance of this contract.

"5. State of health and appearance of First Party, his servants and employees, engaged in performance of this contract.

"6. Maintain courteous and salesmanlike relations wtih customers."